**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Williams J05660 C1/104 LEGAL

| | | |
|---|---|---|
| Postage | $ | 1.21 |
| Certified Fee | | 1.40 |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 2.61 |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
Atty General Bill Lockyear
Street, Apt. No.; or PO Box No.
PO Box 94255
City, State, ZIP+4
SAC, CA. 94244

PS Form 3800, February 2000        See Reverse for Instructions

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Williams J05660 C1/104 LEGAL

| | | |
|---|---|---|
| Postage | $ | 1.21 |
| Certified Fee | | 1.40 |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 2.61 |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
T. Orloff. Dist. Atty. Co. of Alameda
Street, Apt. No.; or PO Box No.
900 Courthouse - 1225 Fallon St.
City, State, ZIP+4
OAKLAND Ca. 94612

PS Form 3800, February 2000        See Reverse for Instructions

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Williams J05660 C1/104 LEGAL

| | | |
|---|---|---|
| Postage | $ | 1.21 |
| Certified Fee | | 1.40 |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 2.61 |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
Alameda Co. Chief Clk
Street, Apt. No.; or PO Box No.
1225 Fallon St. Room 109
City, State, ZIP+4
OAKLAND, Ca. 94612

PS Form 3800, February 2000        See Reverse for Instructions

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Williams J05660 C1/104

| | | |
|---|---|---|
| Postage | $ | 1.21 |
| Certified Fee | | 1.40 |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 2.61 |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
City Atty. John Russo
Street, Apt. No.; or PO Box No.
City Hall - Plaza Ct. Fl.
City, State, ZIP+4
OAKLAND, Ca. 94612

PS Form 3800, February 2000        See Reverse for Instructions

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

Williams J05660 C1/104

| | | |
|---|---|---|
| Postage | $ | 1.21 |
| Certified Fee | | 1.40 |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 2.61 |

Recipient's Name (Please Print Clearly) (to be completed by mailer)
Mayor Jerry Brown
Street, Apt. No.; or PO Box No.
1 City Hall Plaza
City, State, ZIP+4
OAKLAND, Ca. 94612

PS Form 3800, February 2000        See Reverse for Instructions

A. Exhibit
Proof of
Service
Complaint

*Exhibit B*

# CITY OF OAKLAND



ONE FRANK H. OGAWA PLAZA • 6TH FLOOR • OAKLAND, CALIFORNIA 94612

Office of the City Attorney
John A. Russo
City Attorney

(510) 238-3601
FAX: (510) 238-6500
TDD: (510) 839-6451

September 14, 2000

Antonio Williams, #JO5660
High Desert Prison
Facility C-1-104
PO Box 3030
Susanville, California 96127

**Subject:** *Letter dated September 6, 2000 regarding Deputy District Attorney Daniel Burke*

Dear Mr. Williams:

I have reviewed your letter dated September 6, 2000 to determine whether the City Attorney's Office could provide some direct assistance in resolving your complaint as described in your letter.

It appears that the issues you have raised in your letter (i.e. public corruption, perjury, obstruction of justice, etc.) allegedly committed by Deputy District Attorney Daniel Burke are best addressed in any appeal you may have already filed or may file seeking to overturn your conviction and/or sentence. As you are aware, the City Attorney's jurisdiction and authority rests within the City of Oakland. With respect to the prosecution and/or defense of criminal cases, that authority rests with the District Attorney's Office and Public Defender's Office, respectively.

Since it appears that your letter was also forwarded to the District Attorney's Office, all further responses to your concerns would appropriately come from their office.

Very truly yours,

JOHN A. RUSSO
City Attorney

JAR:kar
255579



Civil Rights Division

*Exhibit C*

168-11E-0/125981

*Special Litigation Section*
*P.O. Box 66400*
*Washington, DC 20035-6400*

February 26, 2001

Antonio Williams
#J05660
High Desert Prison Facility
PO Box 3030
Susanville, CA  96127

Dear Mr. Williams:

Under the Civil Rights of Institutionalized Persons Act, (CRIPA) 42 U.S.C. § 1997 et seq., the United States Department of Justice has authority to investigate complaints concerning conditions in public institutions.  These institutions include prisons, jails, juvenile facilities, mental health and retardation facilities, and publicly operated nursing homes.

When a pattern or practice of the deprivation of constitutional rights is determined to exist, we have the authority to initiate civil actions against state or local officials to remedy unconstitutional conditions.  This authority does not extend to investigating the personal grievances of a single individual.  The Department of Justice is not authorized to represent individual citizens in legal matters or to give them legal advice.  Therefore, we are unable to provide you with legal opinions or assistance with personal lawsuits or legal matters.

If you wish to pursue this matter further, you might consider contacting a private attorney or a legal services lawyer.  This individual may assist you in determining what, if any, remedies may be available to you.

Thank you for your correspondence.

Sincerely,

Special Litigation Section
Civil Rights Division

*Exh. D*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL
FILED
FEB 2 2 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

| | |
|---|---|
| ANTONIO LUIS WILLIAMS, | No. C 04-1329 CW (PR) |
| Plaintiff, | ORDER GRANTING DEFENDANTS' |
| v. | MOTION FOR SUMMARY JUDGMENT AND TERMINATING ALL PENDING MOTIONS |
| DIRECTOR OF DOJ, JOHN ASHCROFT, ET AL., | (Docket nos. 27, 8, 9, 11, 12, 14, 15, 20, 21, 22, 24, 25, |
| Defendants. | 31, 32, 34, 38) |

INTRODUCTION

Plaintiff Antonio Luis Williams, a State prisoner incarcerated at Pelican Bay State Prison (PBSP), filed this civil action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, requesting the Court to enjoin Defendants, officials of the Department of Justice (DOJ), from denying him access to documents which will prove that he is innocent of the crimes for which he was convicted.[1]  The Court directed Defendants to respond to the complaint.  Now pending is Defendants' motion for summary judgment, which has been briefed fully by the parties.  For the reasons discussed below, the Court GRANTS the motion for summary judgment.

STANDARD OF REVIEW

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the nonmoving party, the movant is

---

[1] This Court denied on the merits Petitioner's federal petition for a writ of habeas corpus challenging the constitutional validity of his conviction.  See Williams v. Runnels, 02-2310 CW (Order Denying Petition for a Writ of Habeas Corpus, Mar. 4, 2004).  Petitioner appealed that ruling to the Ninth Circuit.  On January 18, 2005, the Ninth Circuit affirmed the judgment of the District Court.

United States District Court
For the Northern District of California

1   clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

2   56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

3   Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

4   1987).

5        The moving party bears the burden of showing that there is no

6   material factual dispute.  Material facts which would preclude

7   entry of summary judgment are those which, under applicable

8   substantive law, may affect the outcome of the case.  The

9   substantive law will identify which facts are material.  Anderson

10  v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the moving

11  party does not bear the burden of proof on an issue at trial, the

12  moving party may discharge its burden of showing that no genuine

13  issue of material fact remains by demonstrating that "there is an

14  absence of evidence to support the nonmoving party's case."

15  Celotex, 477 U.S. at 325.  The burden then shifts to the nonmoving

16  party, who must go beyond the pleadings and, by its own affidavits

17  or discovery, "set forth specific facts showing that there is a

18  genuine issue for trial."  Fed. R. Civ. P. 56(e).  A complete

19  failure of proof concerning an essential element of the nonmoving

20  party's case necessarily renders all other facts immaterial.

21  Celotex, 477 U.S. at 323.  For purposes of summary judgment the

22  court must regard as true the opposing party's evidence, if

23  supported by affidavits or other evidentiary material.  Celotex,

24  477 U.S. at 324; Eisenberg, 815 F.2d at 1289.

BACKGROUND

26       The following statement of facts is undisputed unless

27  otherwise noted, and is taken from the allegations in Plaintiff's

28  verified complaint and the declarations and evidence submitted by

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1 | the parties in support of and in opposition to the motion for
2 | summary judgment.

3 | In February, 2000, Plaintiff sent what he refers to as a
4 | "corruption complaint" against the Oakland Police Department to
5 | John Ashcroft at the DOJ. In January, 2001, he sent a copy of a
6 | September, 2000, complaint to President Bush, informing him that
7 | DOJ officials had taken no action. Plaintiff received a letter
8 | from the DOJ dated February 26, 2001. The letter was from the
9 | Special Litigation Section of the Civil Rights Division (CRD). It
10 | informed Plaintiff that the CRD's authority does not extend to
11 | investigating individual grievances and suggested that Plaintiff
12 | consider contacting a private attorney. See Hermilla Decl. in
13 | Support of Motion for Summary Judgment, Ex. B. The letter was
14 | assigned DOJ file number 168-11E-0/125981.

15 | Thereafter, Plaintiff submitted a FOIA request to the DOJ
16 | asking for all information and documents contained in DOJ file
17 | number 168-11-E-0/125981. The CRD received the request on July 5,
18 | 2002, and the FOI/PA Branch of the CRD received the request on
19 | March 7, 2003. See id., Ex. A. In response to the request, the
20 | FOI/PA Branch searched to locate responsive records and determined
21 | that, other than the February 26, 2001, letter from the Special
22 | Litigation Section, the CRD had no responsive documents. This
23 | determination was confirmed by the fact that Plaintiff's February
24 | 26, 2001, letter had a "0" file number, which indicated that no
25 | investigation was opened and that any records in the "0" file would
26 | have been destroyed in accordance with the National Archives and
27 | Records Administration records retirement schedule.

28 | In a letter dated August 13, 2003, the Chief of the FOI/PA

3

United States District Court
For the Northern District of California

Branch explained to Plaintiff that no documents existed within DOJ file 168-11E-0 and informed him of his appeal rights.  On September 5, 2003, Plaintiff sent an appeal to the DOJ Office of Information and Privacy.  In a letter dated November 26, 2003, that office affirmed the CRD's actions.

Plaintiff filed this action on April 6, 2004.  In an Order dated June 24, 2004, the Court directed Defendants to respond to the complaint.  Upon receiving the Court's Order, the FOI/PA Branch learned for the first time of letters that Plaintiff had sent to Tamara Miller, the former Deputy Chief of the Criminal Section. The FOI/PA Branch then conducted additional FOIA searches--both manual and computer-based--to determine if there were any further responsive documents.  The FOI/PA Branch's additional searches revealed that the Criminal Section had opened a file and sent information relating to Plaintiff's allegations to the Federal Bureau of Investigation (FBI).  The FOI/PA Branch's additional inquiry also revealed that the Criminal Section's file on the matter is an open investigation.

In a letter dated September 3, 2004, the FOI/PA Branch informed Plaintiff that he might wish to contact the FBI to request any documents relating to his allegations.  In addition, on September 14, 2004, the FOI/PA Branch produced eighteen pages of responsive documents relating to the Criminal Section's open investigation, but withheld fourteen pages of documents under various provisions of the FOIA.  Specifically, the CRD denied Plaintiff access to attorney e-mails and other notes regarding its investigation of Plaintiff's allegations, pursuant to 5 U.S.C. § 552(b)(7)(A), on the ground that disclosure thereof could

4

1 | reasonably be expected to interfere with ongoing law enforcement
2 | proceedings.  The CRD also denied access to these records pursuant
3 | to 5 U.S.C. § 552(b)(5), on the ground that the records contain
4 | attorney work product and pre-decisional deliberative materials,
5 | and pursuant to 5 U.S.C. § 552(b)(7)(C), on the ground that
6 | disclosure thereof could reasonably be expected to constitute an
7 | unwarranted invasion of the personal privacy of witnesses,
8 | interviewees and/or targets.  Plaintiff did not file an appeal
9 | regarding the September 14, 2004, response to his request.

## DISCUSSION

11 | The FOIA mandates a policy of broad disclosure of government
12 | documents when production is properly requested of an agency.  See
13 | 5 U.S.C. § 552(a).  The FOIA obligates the government to produce
14 | documents within its "possession or control."  See Kissinger v.
15 | Reporters Comm. for Freedom of Press, 445 U.S. 136, 150-51 (1980).
16 | If a government agency claims that it does not possess or control a
17 | requested document, the agency must show it fully discharged its
18 | statutory obligations by conducting a search reasonably calculated
19 | to uncover all relevant documents.  See Urban v. United States, 72
20 | F.3d 94, 95 (8th Cir. 1995); Weisberg v. United States Dep't of
21 | Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  The issue to be
22 | resolved is not whether there might exist any other documents
23 | possibly responsive to the request, but rather whether the search
24 | for those documents was adequate.  The adequacy of the search, in
25 | turn, is judged by a standard of reasonableness and depends upon
26 | the facts of each case.  See Zemansky v. EPA, 767 F.2d 569, 571
27 | (9th Cir. 1985).

28 | An agency may withhold a requested document only if it falls

United States District Court
For the Northern District of California

5

United States District Court
For the Northern District of California

1   within one of nine statutory exemptions to the disclosure

2   requirement.  See Dobronski v. FCC, 17 F.3d 275, 277 (9th Cir.

3   1994) (citing 5 U.S.C. § 552(b)).  The FOIA establishes federal

4   district court jurisdiction to conduct de novo review of agency

5   decisions to deny requested access to agency records.  Jurisdiction

6   is dependent upon a showing that an agency has (1) improperly (2)

7   withheld (3) agency records.  See Kissinger, 445 U.S. at 150.

8   "Judicial authority to devise remedies and enjoin agencies can only

9   be invoked, under the jurisdictional grant conferred by § 552, if

10  the agency has contravened all three components of this

11  obligation." Id.

12      The FOIA requires that administrative appeals be exhausted

13  before suit may be brought in federal court.  See Hymen v. Merit

14  Systems Protection Bd., 799 F.2d 1421, 1423 (9th Cir. 1986), cert.

15  denied, 481 U.S. 1019 (1987).  Failure to do so is grounds for

16  dismissal for lack of subject matter jurisdiction.  Id.

17      Defendants argue that Plaintiff's complaint must be dismissed

18  as moot because the CRD FOI/PA Branch has provided him with

19  eighteen pages of responsive documents and he has not challenged

20  that decision.  Defendants also assert that any challenge to their

21  withholding of fourteen pages of exempt documents under 5 U.S.C.

22  §§ 552(b)(7)(A), (b)(5) and (b)(7)(C) must be dismissed because

23  Plaintiff has not exhausted his administrative remedies.

24      The Court agrees with Defendants' assessment.  An action to

25  compel the production of documents under the FOIA is mooted when

26  the agency in control of the requested documents delivers them to

27  the plaintiff.  See Carter v. Veterans Admin., 780 F.2d 1479, 1481

28  (9th Cir. 1986).  Dismissal is then warranted.  See id.  This is so

6

United States District Court
For the Northern District of California

1  even if the documents are provided after the Plaintiff has filed
2  suit in district court, and notwithstanding the agency's initial
3  provision of erroneous and incomplete information to the Plaintiff.
4  Id.; see also Papa v. Untied States, 281 F.3d 1004, 1013 (9th Cir.
5  2002) (production of all nonexempt material, however belatedly,
6  moots FOIA claims).  Here, Plaintiff's complaint sought to enjoin
7  Defendants from withholding documents responsive to his FOIA
8  request.  Since the complaint was filed Defendants have provided
9  Plaintiff with all responsive material which they claim is
10 nonexempt.  Plaintiff has not challenged this decision by way of an
11 agency appeal and his opposition to Defendants' motion for summary
12 judgment does not address Defendants' argument.  Accordingly,
13 because the agency has provided Plaintiff with all responsive
14 nonexempt documents in its possession and Plaintiff has not
15 challenged this decision, his request for Court action is moot.
16     To the extent Plaintiff is dissatisfied with Defendants'
17 response to his FOIA request and seeks access to the documents
18 which Defendants claim are exempt, he must exhaust all DOJ CRD
19 FOI/PA administrative remedies before pursuing such claim in
20 federal court.  In his September 14, 2004, letter to Plaintiff,
21 Nelson Hermilla, Chief of the CRD, tells Plaintiff how he can
22 appeal the CRD's decision.
23     Plaintiff has failed to raise a triable issue of fact with
24 respect to whether his claim that Defendants have failed to provide
25 him with responsive documents is moot.  He also has failed to raise
26 a triable issue of fact with respect to whether he has exhausted
27 administrative remedies in response to Defendants' refusal to
28 provide him with certain documents.  Accordingly, summary judgment

7

United States District Court

For the Northern District of California

1   is GRANTED to Defendants on the grounds of mootness and

2   nonexhaustion of administrative remedies.

3                   PLAINTIFF'S PENDING MOTIONS

4        Since June 28, 2004, Plaintiff has filed fifteen ex parte

5   motions, which the Court now reviews.

6        Plaintiff has filed two motions for immediate injunctive

7   relief.  He seeks transfer to a hospital to X-ray a dislocated

8   shoulder he suffered after allegedly being beaten in 2002.  This

9   claim was addressed by the Court in Plaintiff's action, Williams v.

10  Runnels, C 04-0782 CW, filed on March 16, 2004.  Accordingly, the

11  motions for immediate injunctive relief are DENIED (docket nos. 8,

12  20).

13       Plaintiff has filed two motions asking the Court to recuse

14  itself from presiding over this action.  Specifically, Plaintiff

15  maintains that the Court's denial of his federal habeas petition

16  (Williams v. Runnels, C 02-2310 CW) was erroneous and the Court is

17  biased against him.  Plaintiff's allegations are legally

18  insufficient to establish that the Court has a personal bias or

19  prejudice against him.  Accordingly, the motions for recusal are

20  DENIED (docket nos. 9, 24).  See 28 U.S.C. § 144; United States v.

21  $292,888.04 in U.S. Currency, 54 F.3d 564, 566 (9th Cir. 1995)

22  (affidavit inadequate when based on mere conclusory allegations).

23  Plaintiff's motions asking the Court to notify the Ninth Circuit

24  that his conviction should be reversed based on newly discovered

25  evidence are also DENIED (docket nos. 31, 34, 38).  Plaintiff

26  should have raised any arguments concerning this Court's ruling on

27  his habeas petition to the Ninth Circuit in his appeal.

28       Plaintiff has filed two motions to award monetary damages.

                                  8

1    Damages are not available in a FOIA action.  See 5 U.S.C.

2    § 552(a)(4)(B); Gale v. United States Dep't of Justice, 628 F.2d

3    224, 226 n.4 (D.C. Cir. 1980).  Accordingly, these motions are

4    DENIED (docket nos. 14, 32).

5        Plaintiff has filed two discovery motions asking the Court to

6    order the DOJ to provide him with documents.  Access to these

7    documents is the gravamen of Plaintiff's FOIA claim, which has been

8    denied for the reasons set forth above.  Accordingly, these

9    discovery requests are DENIED as moot (docket nos. 11, 21).

10       Plaintiff has filed a motion asking the Court to reconsider

11   that portion of its June 24, 2004, Order dismissing Plaintiff's

12   non-FOIA claims.  Plaintiff has not presented persuasive grounds

13   for reconsideration.  Accordingly, this motion is DENIED (docket

14   no. 12).  See Civil L.R. 7-9.

15       Plaintiff's motions to appoint counsel, to call an expert

16   witness and for leave to proceed in forma pauperis are DENIED as

17   moot (docket nos. 15, 22, 25).

                                CONCLUSION

19       For the foregoing reasons, Defendants' motion for summary

20   judgment is GRANTED.  (Docket no. 27).  The Clerk of Court shall

21   terminate all pending motions and enter judgment in favor of

22   Defendants.

23       IT IS SO ORDERED.

24   DATED:   2/22/05

25                        /s/ CLAUDIA WILKEN

26                        _____
                         CLAUDIA WILKEN
27                        United States District Judge

28

United States District Court
For the Northern District of California

"Exh E"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: ANTONIO LUIS WILLIAMS,

        Plaintiff.

_____/

Nos. C 04-3211 CW (PR)
     C 04-3346 CW (PR)
     C 04-4243 CW (PR)
     C 04-4335 CW (PR)
     C 04-4664 CW (PR)
     C 04-5039 CW (PR)
     C 04-5040 CW (PR)

ORIGINAL
FILED

DEC 2 2 2004

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ORDER DENYING LEAVE TO
PROCEED IN FORMA PAUPERIS
AND DISMISSING ACTIONS

United States District Court
For the Northern District of California

Plaintiff Antonio Luis Williams is a prisoner of the State of California who is incarcerated at Pelican Bay State Prison. Since August 6, 2004, he has filed in this Court the seven civil rights actions captioned above. In each action he seeks leave to proceed _in forma pauperis_. For the reasons set forth below, leave to proceed _in forma pauperis_ is DENIED and these actions are DISMISSED pursuant to 28 U.S.C. § 1915(g).

The Prison Litigation Reform Act of 1995 (PLRA), which was enacted on April 26, 1996, provides that a prisoner may not bring a civil action or appeal a civil judgment under the _in forma pauperis_ provisions of 28 U.S.C. § 1915:

> [I]f the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The court may count as strikes dismissals of district court cases as well as dismissals of appeals. See Rodriguez v. Cook, 169 F.3d 1176, 1178 (9th Cir. 1999) (prisoner does not get three frivolous claims and three frivolous appeals

United States District Court

For the Northern District of California

1  before being barred by § 1915(g)).  A prisoner barred from
2  proceeding in forma pauperis pursuant to § 1915(g) may proceed
3  under the fee provisions of 28 U.S.C. §§ 1911-14 applicable to
4  everyone else.  Adepegba v. Hammons, 103 F.3d 383, 388 (5th Cir.
5  1996).

6      Since February 6, 2004, Plaintiff has filed fourteen civil
7  rights actions in this Court.  The Court has dismissed three or
8  more of these prior prisoner actions on the grounds that they were
9  frivolous, or malicious, or failed to state a claim upon which
10  relief may be granted.  See Williams v. McGrath, C 04-0782 CW
11  (dismissed for failure to state a claim on June 25, 2004); Williams
12  v. McGrath, C 04-2542 CW (dismissed for failure to exhaust
13  administrative remedies on November 10, 2004); Williams v. Hagar,
14  C 04-2543 CW (dismissed for failure to state a claim on November
15  10, 2004).  In addition, Plaintiff's appeal of C 04-0782 was
16  dismissed by the Ninth Circuit.  See Williams v. McGrath, C 04-0782
17  CW (mandate of Ninth Circuit dismissing appeal on October 15,
18  2004).  As such, any non-habeas civil action filed by Plaintiff is
19  now subject to the provisions of § 1915(g).
20

21      The Court has conducted a preliminary review of the seven
22  actions captioned above to assess the nature of Plaintiff's
23  allegations and to determine whether he alleges facts which bring
24  him within the "imminent danger of serious physical injury"
25  exception to § 1915(g).  The Court concludes that the actions are
26  duplicative of prior actions filed by Plaintiff and dismissed by
27  the Court: they challenge the Court's denial of Plaintiff's federal
28  habeas corpus petition (Williams v. Runnels, C 02-2310 CW), seek to
   have the Court removed from presiding over any other actions filed

1  by Plaintiff, complain of mail tampering, and challenge the

2  findings of an investigation into the alleged use of force against

3  Plaintiff by prison officials at High Desert State Prison in 2002.

4  None of these complaints qualify for the § 1915(g) exception.

5  Accordingly, they are subject to dismissal.

6      Because the claims raised in these actions are duplicative of

7  claims raised and dismissed in prior actions and are otherwise

8  without legal merit, the Court finds that it would be futile to

9  grant Plaintiff leave to amend.  Morever, even if Plaintiff did

10  amend to allege cognizable claims for relief, he would be required

11  to pay the $150.00 filing fee in each action because he is now

12  barred from proceeding _in forma pauperis_ as a matter of course in

13  this Court.  Accordingly, all of the actions listed above are

14  DISMISSED without prejudice under § 1915(g).  If Plaintiff is so

15  inclined, he may bring his claims in new actions, each accompanied

16  by the $150.00 filing fee.  The Court will continue to review under

17  § 1915(g) all future actions filed by Plaintiff while he is

18  incarcerated in which he seeks _in forma pauperis_ status.

19  

20      The Clerk of Court shall enter judgment and terminate all

21  pending motions in these actions.

22      IT IS SO ORDERED.

23  DATED: 12/22/04        /s/ CLAUDIA WILKEN

24  

25                         _____
                           CLAUDIA WILKEN
                           United States District Judge

26  

27  

28  

United States District Court
For the Northern District of California

3

*Exh F*

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA    Dept. No. 9

Date: November 30, 2004    Hon. LARRY J. GOODMAN, Judge    Fil R. Cruz, Dep.Clk.
Not Reported, Reporter

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA | Counsel appearing for Plaintiff | No Appearances, Deputy District Attorney |
| Plaintiff | | |
| VS. | Counsel appearing for Defendant | No Appearances |
| ANTONIO WILLIAMS | | |
| Aka:  JAMES JOHNSON | Probation Officer appearing | None Present |
| Defendant | Deputy | |

Nature of Proceedings:  ORDER OF THE COURT
RE: EX PARTE LETTER

**Case No. 130594**
**PFN: ALQ822**
**CEN: 7144079**

The Court treating the document dated November 7, 2004 as a writ for habeas corpus, hereby orders the writ of habeas corpus is denied.  The document fails to state a prima facie case for relief.  The document received by the Court fails to state any legal basis to set aside or reverse the defendant's conviction.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served **ORDER OF THE COURT, on ANTONIO WILLIAMS aka: JAMES JOHNSON, DOCKET # 130594** by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

ANTONIO WILLIAMS
Aka: JAMES JOHNSON
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA 95531-7000
CDC or ID Number J05660

Dated: December 8, 2004

By: 
Fil R. Cruz
Deputy Clerk

J:\Courtrooms\Dept 09\Exparte Letter - Williams, Antonio.doc
(Rev. 03/03)



## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA     Dept. No. 9

Date: February 23, 2006     Hon. LARRY J. GOODMAN, Judge     Fil R. Cruz, Deputy Clerk.
Not Reported, Reporter

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA | Counsel appearing for Plaintiff | No Appearance |
| Plaintiff | | |
| vs.<br>ANTONIO WILLIAMS<br>Aka: JAMES JOHNSON | Counsel appearing | No Appearance |
| | for Defendant | |
| Defendant | Probation Officer appearing | No. Appearance |

Nature of Proceedings:  **ORDER OF THE COURT**
**REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

**Case No. 130594**
**PFN:   ALQ822**
**CEN:  7144079**

Petition for writ of habeas corpus is denied.  The Petition is untimely and petitioner fails to demonstrate good cause for the delay.  Further Petitioner has not explained why the Petition is exempt from the timeliness requirements.  If the Petition is timely or exempt from the timeliness requirements, the Petition fails to state a prima facie case for relief.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served **ORDER OF THE COURT** by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Antonio Williams J05660
California Correctional Institute
P O. Box 1906  4D-6C-105
    ʼhapi, Ca 93507

Dated.  February 28, 2006

By: _____
    Fil R. Cruz, Deputy Clerk

Writ - Williams, Antonio

*Exh iF2*

COPY

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## IN AND FOR THE
## FIRST APPELLATE DISTRICT
## DIVISION FIVE

In re ANTONIO LUIS WILLIAMS on Habeas Corpus.

**FILED**

MAY 0 5 2006

Court of Appeal No. A113319
Alameda Co. Super. Ct. No. 130594

Court of Appeal - First App. Dist.
**DIANA HERBERT**
By_____

BY THE COURT:*

    The petition for writ of habeas corpus is denied. (*In re Dixon* (1953) 41 Cal.2d 756, 759.)

Date    MAY 05 2006          **SIMONS, J.**    Acting P.J.

* Before Simons, Acting P.J., Gemello, J. and Reardon, J. (Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution)



MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR

JORGE NAVARRETE
SUPERVISING DEPUTY CLERK

SAN FRANCISCO
—

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK

LOS ANGELES

□  SAN FRANCISCO 94102
EARL WARREN BUILDING
350 McALLISTER STREET
(415) 865-7000

□  LOS ANGELES 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 830-7570

## Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT
May 26, 2006

Antonio Luis Williams #J-05660
California Correctional Institution
P.O. Box 1906
Tehachapi, CA 93581

    Re:    **A113319 – Antonio Luis Williams on Habeas Corpus Petition for Review**

Dear Mr. Williams:

    We hereby return unfiled your petition for review received May 26, 2006. The record disclosed that the Court of Appeal filed an order denying the petition for writ of Habeas Corpus on May 5, 2006. Under the court rules, the last day a timely petition for review could have been filed was May 15, 2006.

    If you wish to file a petition for writ of Habeas Corpus, we require that you complete the enclosed form as fully as possible. Please sign the completed form at the bottom of page six. We must have an original signature. You may attach documents to this form.

    We require an original and ten copies of the enclosed form are required from you. Your institution has facilities for making the required number of copies. If the institution refuses to make copies, we will accept the original alone.

            Very truly yours,

            FREDERICK K. OHLRICH
            Court Administrator and
            Clerk of the Supreme Court

            By: Robert R. Toy

Enclosure



MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR

JORGE NAVARRETE
SUPERVISING DEPUTY CLERK

SAN FRANCISCO

——

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK

LOS ANGELES

⊠ SAN FRANCISCO, CA 94102
EARL WARREN BUILDING
350 McALLISTER STREET
415-865-7000

——

☐ LOS ANGELES, CA 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
213-830-7570

### Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

June 12, 2006

Mr. Antonio Williams J-05660
California Correctional Institute
P.O. Box 1906
Tehachapi, CA 93561

Re:    **Court Appeal Case No:  A113319 – Petition for Review**

Dear Mr. Williams:

We hereby return unfiled your documents, which we received June 9, 2006. A check of the Court of Appeal docket shows that the petition for a writ of review was denied May 5, 2006. This court lost jurisdiction to act on any petition for review June 5, 2006. (See Cal. Rules of Court, rule 28(e).) Without this jurisdiction, this court is unable to consider your request for legal relief.

If you wish to file a petition for writ of habeas corpus, we require that you complete the enclosed form as fully as possible. Please sign the completed form at the bottom of page six. We must have an original signature. You may attach documents to the form.

We require an original and ten copies of the petition form from you. Your institution has facilities for making the required number of copies. If the institution refuses to make copies, we will accept the original alone.

Very truly yours,

FREDERICK K. OHLRICH
Court Administrator and
Clerk of the Supreme Court

By: Cindy Agno, Deputy Clerk

Enclosures

*Exh F5*

S145111

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re ANTONIO LUIS WILLIAMS on Habeas Corpus

Petition for writ of habeas corpus is DENIED.  (See *In re Robbins* (1998) 18 Cal.4th 770, 780.)

SUPREME COURT
**FILED**

FEB - 7 2007

Frederick K. Ohlrich Clerk

_____
Deputy

_____
GEORGE
Chief Justice

*Exh G*

HEARING OF EVIDENCE IN ANTONIO WILLIAMS

1

2  Taken At: DeFenDants 6-17-97 Revocation parole
          hearing at santa rita Jail

3  Taken By:

4  Date of Statement: 6-17-97 "unDocumented" photoLineup Evidence In the case

5  Time: No.130594, on pg.5

6  Present: parole Hearing - photolineup on pg.5

7  Transcribed By:

                              Connie Miner

8                              Office of the District Attorney

   Date of Transcription:

9                              September 4, 1998

10                    · · · · · · · · · · · · · · · · · ·

11  Q.    Okay. Thank you for coming in. Are you Sergeant Juarez?

12  SERGEANT JUAREZ:  Yes, I am.

13  Q.    Okay. Very good. And what's your first name sir?
14  A.    Ed. Or Edward actually.

    Q.    J - A - U - R - E - Z?
15  A.    J - U - A.

16  Q.    J - U - A - R - E - Z,  And what city?
    A.    With Oakland Police Department.
17

    Q.    Okay. You testified in these before?
18  A.    Yes.

19  Q.    Okay. Will you raise your right hand? You solemnly the testimony given here in the police report
20        is nothing but the truth?
    A.    I do.

21  Q.    Thanks. Uh, Mr. Hill I may need a continuation here possibly. Okay. Sir, uhm, were you with
          Officer Macbang or Officer Ashford?
22  A.    Actually I was the uh, the main follow-up investigator on the bank robberies.

23  Q.    Okay. So, you don't know anything about cocaine possession?
    A.    No.
24

25  Q.    Or selling street drugs or possession of drugs on the street?
    A.    No.

26  Q.    Or anything about a battery that he allegedly hit his brother?
    A.    Well, that kind, that, that's what brought him into custody on the bank robbery.
27

28  Q.    You know something about that huh?
    A.    I, I know something about that from, 'cuz I have close contact with the investigators who were
          there.

Alameda County

1   Q.   When did they occur?

A.   Uh, the first one was March 25th of '97 and the second one was March 27th of '97.

2

Q.   March 25th and March?

3   A.   27th.

Q.   27th?  What banks were they?

A.   Uhm, American Savings Bank at 3241 Lakeshore and Mission National Bank at 2200 MacArthur Boulevard.

Q.   And how much money was taken?

A.   First one, American Saving's, uh, 11 oh 5, 1 thousand, 1 hundred and 5 dollars.  That's the preliminary count and then the second bank 2 thousand dollars at Mission National.

Q.   So, the photos look like Mr. Williams, huh?

A.   Yes.

Q.   You've seen those photos?

A.   Yes.

Q.   And both banks, they both look like him?

A.   Yes.

Q.   Okay.  And uh, his brother said that he thought he was the one that did it, huh?

13   A.   Yes, we printed some uh, an article in the paper of one of the surveillance photos and his brother also identified him.

14

Q.   Brother ID'd?  Anybody else in the family identified him?  Sister, aunts, uncles?

15   A.   I believe his sister did, but she didn't want to give a statement.

16   Q.   And, and he denied it, huh?

A.   Yes.

17

Q.   Subject denied it.  Any other witnesses in the bank?

18   A.   Yes, that Mission National.  We did a photo line-up.

19   Q.   Uh-huh.

A.   And we, it was Monday night and we brought in three, well, we brought in about six witnesses from

20   three different banks and the Mission National Bank, we brought in three witnesses and out of those three witnesses, two positively identified him and one put a question mark and his only doubt

21   was that when he was in the bank he appeared taller and cleaner shaven.  But other than that, it was the same build and it was him.

22

Q.   And so two guys, two people at the Mission identified him.  How about the other bank, anybody

23   identify him?

A.   No, at the other American Savings Bank, they did not identify him.

24

Q.   Any other evidence.  I mean uh, license plates or anything else that would tie him to these

25   robberies?

A.   No.  I mean in, inconsistency here in the statements.  I guess when I interviewed him the first time

26   he's saying he never wears hats.  In the interview, he said he never wears hats and in the picture

27   the guy is wearing a hat so it couldn't possibly be him and then if you notice on the possession of narcotics he was wearing a hat when he was arrested.  And it's little, little things like that but other

28

*Exhibit H*    000174

## O P D

### ADDITIONAL INFORMATION REPORT

OAKLAND POLICE DEPARTMENT
455 - 7th Street
Oakland, CA 94607

RD #

97-27737

| CRIME | [ ] SUPPLEMENTAL | INCIDENT # | | VICTIM  LAST, First, Mid. |
|---|---|---|---|---|
| Robbery | 211 P.C. | | V1 | |

| SUSPECT  LAST, First, Mid. | INCIDENT LOCATION | DATE OF THIS REPORT | ORIGINAL DATE REPORTED |
|---|---|---|---|
| | 3241 Lakeshore | 9 APR 97 | |

| ITEM # | QNTY. | PROPERTY (and/or NARRATIVE)  ITEM TYPE, BRAND, MODEL #, SIZE, COLOR, MARKS, ETC | SERIAL # | VALUE |
|---|---|---|---|---|

On 8Apr97, 1830 Hrs. I went to the jail to put together a physical line-up, which would include Antonio Williams AKA. James Johnson. I had been advised earlier by the jail supervisor, Sgt. R. Stewart, that Williams had stated he was not going to willingly attend the line-up. Sgt. Stewart explained to Williams that he would draw attention to himself if he had to be physically forced to attend the line-up. Sgt. Thurman had also been to the jail and advised Williams that it would be best if he attended the physical line-up without having to be forced. Sgt. Hollomon also did the same. Williams even stated we would have to fight him to get him to attend and he would do whatever he had to do if anyone tried to force him to do anything. Sgt. Brock and I went to the jail and also tried to convince Williams to willingly comply, but he still refused. I handcuffed Williams and tried to walk him throughout the jail to pick his fillers. He refused to pick any fillers. He was brought back to the area near his cell, and we attempted to pick his fillers. Williams was insisting we were setting him up and he wanted a lawyer to witness the line-up. We explained to him he did not have the right to have a lawyer as present as he was not charged with the crime he was being lined up for. He was so insistent, an attempt was made to contact the public defenders office, but there was no one present. He stated he wanted to see the law in "black and white." I showed him the Point of View issued by the Alameda County District Attorney's Office, which cited the case law. Williams was not satisfied and was still screaming at the other people who agreed to attend and intimidating them to refuse. We were unable to get any other prisoners to attend. We began to arrange for police officers in civilian clothing to stand in the line-up, when Williams told me he would comply but he wanted to pick his own fillers. Up to this point he was very hostile, yelling and threatening to resist with force from standing in the line-up. Williams picked his fillers.

The physical lineup was held at the Oakland Police Department Lineup Room. The line was comprised of the following people selected from the general population of the Oakland City jail:

Lineup:

| | | | |
|---|---|---|---|
| 1- | Scott, Markell | MB | |
| 2- | Everett, Milton | MB | |
| 3- | Johnson, James | MB | AMW667 |
| 4- | McGowan, Andrew | MB | ALQ822 |
| 5- | Copes, Eugene | MB | UIB399 |
| 6- | Richardson, Antonio | MB | UHY450 |
| | | MB | AQS167 |

SERIAL #    WATCH    DISTRICT    SUBDIVISION

*Exh I*

```
 1   identification?
 2   A.     That I can recall, once.
 3   Q.   , Just once?
 4   A.     Yes.
 5   Q.     And on one occasion you came down to the Oakland
 6   Police Department and participated in a physical lineup; is
 7   that correct?
 8   A.     Correct.
 9   Q.     As a witness?
10   A.     Correct.
11   Q.     Other than that occasion, the occasion where you
12   came down for the physical lineup, were you ever contacted
13   by the Oakland Police Department regarding viewing a
14   photographic lineup of any kind?
15   A.     No, sir.
16   Q.     When you came to the Oakland Police Department for
17   the physical lineup, did the police officers, did any
18   police officer ask you to view a photographic lineup before
19   you viewed the physical lineup?
20   A.     No, sir.
21   Q.   · Do you remember when it was that you were asked to
22   come down to Oakland Police Department for the physical
23   lineup?
24   A. ·    I don't recall, sir.
25   Q.     Well, do you remember whether it was within a day or
26   two of the robbery or whether it was a week later or two
27   weeks or --
28   A.     It was approximately about a week or two after the
```

*Exh J*

1  JAY B. GASKILL
   PUBLIC DEFENDER
2  ALAMEDA COUNTY COURTHOUSE
   OAKLAND, CALIFORNIA 94612
3  (510) 272-6600

**FILED**
ALAMEDA COUNTY

MAR 23 1998

RONALD G. OVERHOLT, Exec. Off./Clerk
By _____

4

5

6

7        SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

8

9  THE PEOPLE OF THE STATE
   OF CALIFORNIA,                          Dept. No. 7

10              Plaintiff,                   Docket No. 130594

11  v.                                       Hearing Date: March 31, 1998
                                             Time: 2:00 p.m.
12  ANTONIO WILLIAMS,

13

14              Defendant.
   _____/

15

16      **MEMORANDUM OF POINTS AND AUTHORITIES IN
        SUPPORT OF MOTION TO DISMISS INFORMATION**

17  **INTRODUCTION:**

18          By complaint filed on April 15, 1997, defendant Antonio Williams (also known as

19  James Johnson) was charged with the robbery of Gustavo Contreras on March 27, 1997 (Pen. Code,

20  § 211), and with nine prior felony convictions including two alleged as "strikes" (Pen. Code, §§

21  667(e)(2), 1170.12(c)(2)). After a preliminary examination on June 30, 1997, he was held to

22  answer to that charge.

23          By information filed in this Court, defendant is now charged as he was in the

24  complaint. In this nonstatutory motion, defendant requests that the information be dismissed on the

25  ground that his substantial right to discovery was violated at the preliminary examination.

26

27



# STATEMENT OF FACTS:

## A. Testimony at Preliminary Examination

**Gustavo Contreras** was the only witness called by the prosecution at the preliminary examination. On direct examination, he testified as follows:

At around 10:45 a.m. on March 27, 1997, he was working as a teller at Mission National Bank on MacArthur Boulevard in Oakland. (R.T. 6-7.) A man entered the bank and went to teller window number two. (R.T. 7.) Contreras went from a side desk to that window and asked the man, "Can I help you?" (R.T. 7.)

The man handed Contreras a note which read, "I have a gun. Give me the money." (R.T. 7-8.) Contreras told the man that his teller window was at the end of the windows and that he would help him there. (R.T. 8.) The two went to that window. (R.T. 8.) Contreras dropped his keys. (R.T. 8.) The man told him to hurry up. (R.T. 8.)

Contreras gave the man a stack of $20 bills wrapped in a $2000 bundle. (R.T. 8-9.) When the man asked for large bills, Contreras gave him loose $50 and $100 bills. (R.T. 8-9.) Altogether Contreras gave the man about $4900. (R.T. 10.) As soon as the man got the money, he walked out of the bank. (R.T. 9-10.)

During the incident, the man twice told Contreras, "Don't be a hero." (R.T. 9.) Contreras gave the man the money because after receiving the note he was scared. (R.T. 9-10.)

In court at the preliminary examination, Contreras identified defendant as the robber. (R.T. 10.)

On cross-examination, Contreras testified in pertinent part as follows:

When he walked from the side desk to the teller window number two, Contreras noticed just the figure of the man. (R.T. 14.) At that window, the man handed him the note immediately and Contreras told him to go to the other window; they were at window number two for only a couple of seconds. (R.T. 14.) Contreras' window was about 10 feet away. (R.T. 14, 19-20.) When Contreras was removing his keys there, he was looking at his cash drawer but got a momentary glimpse of the man. (R.T. 19-20.) It took a "few seconds" for the man to come into

2

00124

1  possession of the money. (R.T. 21.) Contreras estimated that the man was at his window only "about

2  as minute or two." (R.T. 21.)

3      Contreras described the robber as a black male with a medium complexion, about six

4  feet tall, weighing about 200 pounds, and wearing a blue baseball cap, a gray jacket, a white

5  basketball jersey and a blue T-shirt. (R.T. 16-18.) There was nothing distinctive about his face.

6  (R.T. 17-18.)

7      A week or two after the incident, Contreras attended a lineup conducted by Sergeant

8  Juarez of the Oakland Police Department. (R.T. 24-27.) The lineup was made up of six suspects.

9  ( R.T. 28-29.) Each said, "Don't be a hero." (R.T. 29.) On his lineup card, Contreras put a question

10  mark on suspect number three. (R.T. 30.) When asked to explain the question mark, Contreras said

11  he "knew" that suspect number three was the robber but that there was "something different" about

12  him -- namely, that the man in the lineup was clean shaven while the robber had a scruffy beard on

13  both sides of his face,[1] and that the man in the lineup seemed shorter than the robber. (R.T. 30-33.)

14  Contreras also said he recognized the voice of suspect number three. (R.T. 37.)

15      Contreras  viewed the suspects in the lineup for several minutes. (R.T. 35.) He

16  therefore had more of an opportunity to view suspect number three at the lineup than he did the

17  robber at the bank. (R.T. 36.) But he did not know if attending the lineup made it easier for him to

18  identify defendant in court. (R.T. 35.)

19  **B. Violation of Right to Discovery**

20      Before the preliminary examination, the prosecution failed to disclose the following

21  crucial information to defendant:

22      1. Before conducting the physical lineup on April 8, 1997, Sergeant Edward Juarez

23  or another employee of the Oakland Police Department presented a photographic lineup to Gustavo

24

25

26  [1] When first asked on cross-examination whether the robber had "any facial hair of any kind,"
   Contreras responded, "Not that I can recall." (R.T. 17.) However, when later asked to explain his question

27  mark on the lineup card, Contreras testified that the robber had the scruffy beard and that he did not recall
   having been asked earlier about facial hair. (R.T. 31.)

1  Contreras and the other two witnesses percipient to the robbery. The photographic lineup included

2  a photograph of defendant. It did not include a photograph of any other person who stood in the

3  physical lineup.

4          2. A copy of the robbery note. According to page 1 of the incident report of R. Aven,

5  the robbery note was recovered by technician Gribi.

6          3. A copy of any report(s) by technician Gribi or any other technician concerning this

7  case. According to page 3 of the incident report of R. Aven, technician Gribi "processed the scene."

8  It is likely that Gribi or some other technician dusted the robbery note and surfaces at the bank for

9  fingerprints.

10         4. A copy of all handwritten or typewritten notes and logs of all employees of the

11 Oakland Police Department who have investigated this case. Defendant now has information that

12 Sergeants Aguirre and/or Juarez went to Mission National Bank on the day of the robbery, spoke

13 with the witnesses there, showed them a photograph of the robber created from the bank's

14 surveillance videotape, and took the videotape into evidence. However, the typewritten log of

15 Sergeant Aguirre does not mention any visit to Mission National Bank. And the only written report

16 of any activity by Sergeant Juarez disclosed to defendant thus far is his two-page log re the lineup

17 on April 8, 1997.

18         5. The name, address and telephone number of employees of the Federal Bureau of

19 Investigation who investigated this robbery, and the written reports of such persons including but

20 not necessarily limited to statements taken from witnesses to the robbery.. Defendant now has

21 information that at least one FBI agent was called to the bank after the robbery, assisted or

22 participated in the investigation conducted by the Oakland Police Department, and took a statement

23 from complaining witness Gustavo Contreras.[2]

24

25

26 ─────────────

27         [2] This list is based on information known to defendant at this time. At the time of the hearing
on the motion, defendant may add to the list if other items become known to him.

4

1  ARGUMENT:

2     **THE INFORMATION SHOULD BE DISMISSED, BECAUSE THE PROSECUTION FAILED TO DISCLOSE CRUCIAL INFORMATION ABOUT THE CASE BEFORE THE PRELIMINARY EXAMINATION**

3

4          At the preliminary examination, the defendant has the fundamental rights to full and

5  effective cross-examination of adverse witnesses and to present affirmative evidence on his own

6  behalf.  (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, §§ 7, 15; Pen. Code, §§ 865, 866;

7  *Jennings v. Superior Court* (1966) 67 Cal.2d 867.)

8          Under constitutional guarantees to due process, the defendant is also entitled to

9  disclosure by the prosecution of all favorable evidence that is material to guilt or to punishment.

10  (U.S. Const., Amend. XIV; Cal. Const. art. I, §§ 7, 15; *Brady v. Maryland* (1963) 373 U.S. 83, 87;

11  *People v. Ruthford* (1975) 14 Cal.3d 399.) The prosecution's duty to disclose material favorable to

12  the defense exists "'regardless of whether there has been a request for such evidence..., and

13  irrespective of whether the suppression was intentional or inadvertent.'" (*Izazaga v. Superior Court*

14  (1991) 54 Cal.3d 356, 378.)

15          "[O]ne legitimate goal of discovery is to obtain information 'for possible use to

16  impeach or cross-examine an adverse witness'...[a]bsent some governmental requirement that

17  information be kept confidential for the purpose of effective law enforcement, the state has no

18  interest in denying the accused access to all evidence that can throw light on issues in the case, and

19  in particular it has no interest in convicting on the testimony of witnesses who have not been as

20  rigorously cross-examined and as thoroughly impeached as the evidence permits." (*People v.

21  Memro* (1985) 38 Cal.3d 658, 677, citing *People v. Riser* (1956) 47 Cal.2d 566, 586.) "Suppression

22  of substantial material evidence bearing on the credibility of a key prosecution witness is a denial

23  of due process." (*People v. Morris* (1988) 46 Cal.3d 1, 30.)

24          Where the prosecution has failed to disclose material information which the defendant

25  could have used to attack the credibility of a key prosecution witness at the preliminary

26  examination, the defendant may make a nonstatutory notion to dismiss the information. (*Stanton v.*

27

1    *Superior Court* (1987) 193 Cal.App.3d 265, 269-270; see also *Currie v. Superior Court* (1991) 230

2    Cal.App.3d 83, 89-91; *Merrill v. Superior Court* (1994) 27 Cal.App.4th 1586, 1596.)

3    In *Miller v. Superior Court* (1979) 99 Cal.App.3d 381, the defendant moved for

4    discovery of the address of an informant who was a material witness to the charged sale of a

5    controlled substance. After the District Attorney objected "for the obvious protection of the

6    informant," the court denied the motion. At the preliminary examination, the magistrate precluded

7    the defendant from questioning the witness about his address. The superior court denied the

8    defendant's motion to set aside the information pursuant to Penal Code section 995.

9    The Court of Appeal held that the motion to dismiss the information should have been

10   granted. The court reasoned that the magistrate had violated the defendant's right to cross-

11   examination. The court noted that although significant cross-examination had taken place on other

12   issues, including a recent arrest for controlled substances and a motive to lie, the defendant was

13   deprived of

14       "a *full* opportunity to test the weight and credibility of the witness. The
     possible additional impeachment via the witness' bad reputation for
15   veracity or for extensive narcotics dealing might well have tipped the
     scales of veracity and resulted in the magistrate's disbelief of the
16   witness and refusal to bind over the defendant. *Defendant was entitled
     to a preliminary hearing wherein the veracity of the witness was fully*
17   *and properly tested after revelation of properly discoverable*
     *information about the informant.*" (*Id.*, at pp. 386-387; emphasis
18   added.)

19   In *People v. Mackey* (1985) 176 Cal.App.3d 177, the prosecution failed, prior to the

20   preliminary examination, to disclose to the defendant a statement taken from the principal witness

21   against him. The defendant did not discover the withholding of the statement until jury selection had

22   commenced on the information. He made a motion to dismiss the information pursuant to Penal

23   Code section 995, which the superior court denied.

24   The Court of Appeal held that the information should have been set aside. It reasoned

25   that the effect of the withholding of the statement was to prevent the defendant from effectively

26   cross-examining the witness during the preliminary examination and thus to violate his rights to

27   confrontation and due process:

6

Justice requires that defendant be given a fair hearing in accordance with due process of law. It also requires that the People obey, follow and comply with court orders issued to insure the orderly and constitutional conduct of criminal proceedings. Their failure to do so in the this case was without excuse or explanation. The detriment to appellant was obvious--critical evidence which was required to be produced and was necessary for effective cross-examination was unlawfully concealed and withheld not only from the defendant, but also from the committing magistrate. The failure to disclose the witness' statement operated as a deprivation of due process requiring that the charges be dismissed. (*Id.*, at p. 187.)[3]

In *Stanton v. Superior Court, supra,* 193 Cal.App.3d 265, the prosecution failed to disclose an investigative report which contained statements from percipient witnesses inconsistent with their testimony at the preliminary examination. If believed, the earlier statements would have supported an inference that the defendant had not acted with gross negligence and thus was guilty of only misdemeanor rather than felony vehicular manslaughter. The superior court denied the defendant's nonstatutory motion to dismiss the information.

The Court of Appeal held that the superior court should have stricken the allegation of gross negligence from the information. It reasoned that the defendant "was denied a substantial right by the prosecution's failure to disclose the investigative report...The magistrate, having heard the impeachment of the three key witnesses, might well have stricken the gross negligence allegation..." (*Id.*, at pp. 271-272.)

Before the preliminary examination in the instant case, the prosecution failed to disclose numerous pieces of information which defendant could have used to cross-examine and impeach sole prosecution witness Gustavo Contreras. No less than in *Miller, Mackey* and *Stanton,* the failure to disclose such information had the effect of preventing defendant from effectively cross-examining an adverse witness and thus of violating defendant's fundamental rights to confrontation and due process.

---

[3] In *Mackey* the defendant had obtained a discovery order requiring the prosecution to disclose statements of all witnesses. The Court of Appeal held that under the circumstances of the case "due process required disclosure even without the discovery order" under *Brady* and *Ruthford.* (*Id.*, at p. 187, fn. 11.)

1    Defendant recognizes that the Court of Appeal has held that upon a nonstatutory
2   motion to dismiss for failure to disclose impeachment information, the defendant is required to show
3   prejudice from the violation of his substantial rights. (*Merrill v. Superior Court, supra,* 27
4   Cal.App.4th at pp. 1594-1597 [interpreting *Stanton v. Superior Court, supra,* 193 Cal.App.3d at pp.
5   271-272, and *Currie v. Superior Court, supra,* 230 Cal.App.3d at p. 93].) In other words, the court
6   hearing the motion must "look to the materiality of the nondisclosed information and what effect
7   it had on the determination of probable cause." *(Merrill v. Superior Court, supra,* 27 Cal.App.4th
8   at p. 1596.)

9    However, prejudice is **presumed** where the violation of substantial rights at the
10  preliminary examination is raised before trial on a motion under Penal Code section 995, for upon
11  setting aside of the information the matter can be expeditiously returned to the magistrate for refiling
12  of the complaint and proceedings free of the charged defects. (*People v. Coleman* (1988) 46 Cal.3d
13  749, 773; *People v. Pompa-Ortiz, supra,* 27 Cal.3d at p. 529.) The same presumption of prejudice
14  also should apply where the violation of substantial rights is raised before trial on a nonstatutory
15  motion to dismiss the information, for the matter likewise can be expeditiously returned to the
16  magistrate for refiling of the complaint and proceedings free of the charged defects. In other words,
17  the procedural vehicle by which the violation of substantial rights is established should not
18  determine whether the defendant is entitled to a presumption of prejudice.

19   In *Pompa-Ortiz,* the Supreme Court decided to apply the presumption of prejudice
20  from the denial of a motion under Penal Code section 995 only when the issue was raised before
21  trial, **not** because the motion was based on a statute, but because it already had limited the
22  presumption of prejudice to the denial of other types of motions when they were raised before trial.
23  (*Id.,* at p. 529, citing cases re motions re change of venue and for appointment of attorney of
24  choice].) To the extent that *Merrill* is inconsistent with *Pompa-Ortiz,* it should not and indeed
25  cannot be followed. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.)

26   Assuming arguendo that defendant must show prejudice, he need only show that it is
27  reasonably possible that the magistrate would not have held him to answer if he had impeached

8

00130

1  Contreras with the information belatedly disclosed. (*Chapman v. California* (1967) 386 U.S. 18, 24;

2  *People v. Ruthford, supra,* 14 Cal.3d at p. 409, fn. 3.) As noted above, Contreras  was the sole

3  prosecution witness at the preliminary examination. The failure of the prosecution to disclose the

4  information gave its only witness a false aura of veracity.  (See, e.g., *People v. Turner* (1994) 8

5  Cal.4th 137, 201 ["No witness... is entitled to a false aura of veracity"].) Had Contreras been

6  impeached with the information, the magistrate  may very well have determined that his testimony

7  was not sufficiently credible to support a holding order. (In addition to authorities cited above, see

8  *People v. Espinoza* (1977) 73 Cal.App.3d 287 [conviction reversed because defendant not allowed

9  to impeach prosecution witness with probationary status].)

10  **CONCLUSION:**

11          For the foregoing reasons, the information should be dismissed.

12              DATED: March 20, 1998

13                          Respectfully submitted,

14                          JAY B. GASKILL
                            PUBLIC DEFENDER
15

16                          Harold G. Friedman
                            Chief Assistant Public Defender
17

18                          *Michael McCormick*

19                          Michael McCormick
                          • Assistant Public Defender
20                            California State Bar No. 77355

21  Karen Nance
    Attorney at Law
22  Trial Attorney

23

24

25

26

27

9

1  ACKNOWLEDGMENT OF RECEIPT

2  I hereby acknowledge receipt
   of a copy of this document.

3

4  OFFICE OF THE DISTRICT ATTORNEY
   COUNTY OF ALAMEDA

5  Dated: _____

6  By: _____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

001151

Law Offices
## Alameda County Public Defender



| | | |
|---|---|---|
| **Superior Court** | | **Jay B. Gaskill** |
| 1401 Lakeside Drive, 4th floor | 11  P4 :59 | Public Defender |
| Oakland, CA 94612-4277 | | **Harold G. Friedman** |
| (510) 272-6600 | | Chief Assistant |

## INFORMAL DISCOVERY REQUEST

March 11, 1998

TO:      Dan Burke
         Deputy District Attorney

FROM:    Mike McCormick
         Assistant Public Defender

CASE:    Antonio Williams aka James Johnson

COURT NO: 130594

NEXT COURT DATE: March 31, 1998, for Motion to Dismiss Information

      Pursuant to Penal Code sections 1054.1 and 1054.5 as well as *Brady v. Maryland* (1963) 373 U.S. 83, I hereby request discovery of the following items concerning the robbery at the Mission National Bank on March 27, 1998, with which defendant Antonio Williams is charged in the above case:

      **1. A copy of the robbery note.** According to page 1 of the incident report of R. Aven, the robbery note was recovered by technician Gribi.

      **2. A copy of any report(s) by technician Gribi or any other technician concerning this case.** The discovery we have received thus far does not include any such report(s). According to page 3 of the incident report of R. Aven, technician Gribi "processed the scene." I am informed and believe that Gribi or some other technician dusted surfaces at the bank for fingerprints.

      **3. A copy of any reports resulting from the report(s) by the technicians.** For example, if any latent fingerprints were lifted, any report(s) of comparisons of those prints with known fingerprints of other persons, including defendant.

      **4. A copy of all handwritten or typewritten notes and logs of all employees of the Oakland Police Department who have investigated this case.** I am informed and believe

001152

that Sergeants Aguirre and/or Juarez went to Mission National Bank on the day of the robbery, spoke with the witnesses there, showed them a photograph of the robber created from the bank's surveillance videotape, and took the videotape into evidence. However, the typewritten log of Sergeant Aguirre does not mention any visit to Mission National Bank. (It may be that we have been given only his log for the robbery of American Savings Bank.) And the only written report of any activity by Sergeant Juarez that we have is his two-page log re the lineup on April 8, 1997.

5. **A copy of the bank's surveillance videotape.** As mentioned above, I am informed and believe that on the day of the robbery a bank employee gave the videotape to an OPD sergeant who presumably booked it into evidence. A blank videocassette is enclosed.

6. **A copy of the videotape of the lineup on April 8, 1997.** According to page 2 of the log of Sergeant Juarez, he videotaped the lineup. A second blank videocassette is enclosed.

7. **Copies of all phonographs taken of the lineup on April 8, 1997.** According to page 2 of the log of Sergeant Juarez, Sergeant Aguirre took photographs of the lineup.

8. **A copy of all booking records from the Oakland City jail based on the arrest of defendant on or about April 6, 1997.** This includes, but is not necessarily limited to, the property receipt issued to defendant. These records should show that defendant was in custody not only for a battery on his brother Mark, but also for robbery. The records therefore support a defense argument that the police should have honored the request of defendant for an attorney at the lineup.    *Bail Info records*



9. **A copy of the photographs from the bank surveillance videotape and from the Oakland Tribune on March 28, 1998.** According to pages 1 and 2 of the log of Sergeant Aguirre, these photographs were shown to Mark Williams and Verna Edwards.

10. **The name, address and telephone number of any employees of the Federal Bureau of Investigation who investigated this robbery, and the written reports of such persons.** I am informed and believe that at least one FBI agent was called to the bank after the robbery and assisted or participated in the investigation conducted by OPD.

11. **Inspection of the file kept by the Robbery detail of OPD regarding this robbery.** It is possible that the file contains other information of which I am not aware and therefore am not in a position to request specifically.

12. **Inspection of all items booked into evidence.**

Thank you in advance for your cooperation in complying with this request promptly. If you have any questions about any of the items requested, please do not hesitate to telephone me at 272-6643. Please call me to arrange a time for inspection of the items booked into evidence and the file in the Robbery detail.

3/31

1  JAY B. GASKILL
   PUBLIC DEFENDER
2  ALAMEDA COUNTY COURTHOUSE
   OAKLAND, CALIFORNIA 94612
3  (510) 272-6600

**FILED**
ALAMEDA COUNTY

MAR 2 3 1998

RONALD G. OVERHOLT, Exec. Off./Clerk
By _____

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

THE PEOPLE OF THE STATE
OF CALIFORNIA,

                  Plaintiff,

v.

ANTONIO WILLIAMS,

                  Defendant.
_____/

Dept. No. 7

Docket No. 130594

Hearing Date: March 31, 1998
Time: 2:00 p.m.

**ORDER SHORTENING TIME
(CCP SECTION 1005)**

GOOD CAUSE APPEARING, IT IS HEREBY ORDERED that the time for
defendant to file his Memorandum of Points and Authorities in Support of Motion to Dismiss
Information is shortened from 10 days to 8 days, so that defendant shall file same by March 23,
1998.

DATED: 3/23/98

_____
JUDGE OF THE SUPERIOR COURT

1  THOMAS J. ORLOFF
   District Attorney
2  County of Alameda
   900 Courthouse
3  1225 Fallon Street
   Oakland, CA 94612-4292
4  [510] 272-6222

5  William M. Baldwin
   Assistant District Attorney
6  [State Bar # 42696]

7

**FILED**
ALAMEDA COUNTY

MAR 2 6 1998

CLERK OF THE SUPERIOR COURT
By _Gail Gray_ DEPUTY

995 Date: March 31, 1998

8  # SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  ## COUNTY OF ALAMEDA

10  THE PEOPLE OF THE STATE OF CALIFORNIA,     )
                                               )
11                                             )
                                               )
12                          v.                 )     No. 130594
                                               )
13  ANTONIO WILLIAMS,                          )     Department No. 7
                                               )
14                              Defendant.     )
                                               )

15

16  ### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
        OF MOTION TO DENY MOTION UNDER SECTION 995
17                OF THE PENAL CODE, WITH PREJUDICE

18

19  **ARGUMENT:**

20      I.   The records of this office reveal that service of defendant's moving papers was

21  accomplished on March 23, 1998.

22      Such service certainly does not comport with the requirements of Rule 227.5(a) of the

23  California Rules of Court.

24      Accordingly, defendant's motion ought to be denied with prejudice. Rule 227.5(b); **People**

25  **v. Lewis** (1977) 71 Cal.App.3d 817; **People v. Hallman** (1989) 215 Cal.App.3d 1330, 1342;

26  **People v. Davis** (1989) 215 Cal.App.3d 1348, 1350. See **People v Casillas** (1990) 218

Office of the
*District*
*Attorney*
lameda County
27

28

33

00133

1   Cal.App.3d 1365.*

2       II.' It is unknown where the defense gets the information it now claims was denied it at

3   preliminary examination. Be that as it may, nothing exculpatory appears in the list the defense now

4   provides. Accordingly the *Brady* and *Ruthford* cases have no bearing on this matter.** What

5   governs is Penal Code § § 1054 *et seq.* which provide the sole basis for discovery in criminal

6   cases. Penal Code § 1054.5(a). By the very language of those provisions, they are applicable to

7   *trial* not to *preliminary hearings.*  See Penal Code § 1054.5(b): the timing for discovery

8   compliance is incompatible with preliminary hearing time limits.  Almost all in-custody

9   preliminaries, for example, would have been completed before the time for compelling discovery

10  occurred.  See Penal Code § 859b.

11      For the foregoing reasons, it is respectfully urged that defendant's motion be denied.

12      Dated:  March 24, 1998

13

14

15                                              THOMAS J. ORLOFF
                                                District Attorney
16

17                                      by

18                                              William M. Baldwin
                                                Assistant District Attorney
19

20

21

22

23      *The defense has obtained an order shortening time — with no notice to us. This is the
        second untimely motion to dismiss filed by the defense in *this* case. (The first was filed on
24      January 12th, for January 20th.) This is also the third pretrial motion filed in this matter — not
        counting the defendant's own hand-written efforts. (A 995 motion was denied in this
25      department on December 12, 1997.) With that level of involvement in this case, it it difficult to
        understand why this brief could not have been timely filed. Since the order shortening time
26      appears to have been improvidently granted, we move the defense brief be stricken.

27      **Brady v. Maryland (1963) 373 U.S. 83; People v. Ruthford (1975) 14 Cal.3d 399.*

28                                          -2-

Antonio Williams AhQ822

5825 Brocker Blvd.

Dublin, CA 94566

Pro-per

Exh K

RECEIVED

'98 AUG 11 P4:09

DISTRICT ATTORNEY
ALAMEDA COUNTY

ENDORSED
FILED
ALAMEDA COUNTY

JUL 31 1998

RONALD G. OVERHOLT, Exec. Off./Clerk
By Gail Gray

Superior Court

County of Alameda

The people of the STATE of CALIF,                    NO. 130589

Respondent                                           Dept 7

Vs

Antonio Williams,

Defendant

Motion For Discovery:

Petitioner Motion This Court For An Order

For Discovery From The STATE in That There

Are MATerial evidence in it's possession

THAT was NOT been Turned over To Defense.


1. Identity And Current Address Of informANTs

2. ALL STATements OF The Accused, However

   preserved.

→ 3. ALL Info pertaining To Apr 8th 1997 photo lineup.

4. Videos

5. ALL TApe recordings An other evidence Of

   police Radio CALLs pertaining To The

INVESTIGATION, SURVEILANCE, AND ARREST OF DEFENDANT.

6. NAMES AN Addresses OF Any AN ALL WITNESSES
   The Prosecution INTENDS TO - AND EXPECTS TO
   CALL TO TESTIFY AT TRIAL, DEFENDANT HAVING
   The Right INTERVIEW AND ASCERTAIN WHAT
   Any POTENTIAL WITNESS WILL TESTIFY TO.

7. ALL photographs AND Things OF LATENT Finger-
   prints TAKEN AT SCENCE OF Crime AND ITEMS TAKEN
   Therefrom, INCluding ALL Reports AN A COMPRISEN@
   MADE Therof.

8. photographs THAT HAD Been exhibited TO VICTIM
   TO Identify perpetrator: (OR Any part of
   his body)

9. police Diligence Regarding informers:

10. Recordings OF Accused's CONVERSATION WITH
    police OFFicers AND OF CONVERSATION Between
    police AND VICTIM.

11. Any AN ALL Evidence FAVORABLE TO The ACCUSED:

12. ALL photographs shown To prosecution Witnesses
    AND other persons During The INVESTIGATION
    OF The CASE Which were used IN AN ATTEMPT
    TO Secure OUT - OF - COURT Identification OF
    DEFENDANT:

13. NAMES AND ADDRESSES OF ALL PERSONS WHO FAILED TO IDENTIFY DEFENDANT UPON BEING PRESENTED WITH PHOTOGRAPHS BY OFFICERS INVESTIGATING THE CASE.

14. EVIDENCE TENDING TO AFFECT CREDIBILITY OF EVIDENCE USED BY PROSECUTION.

15. EVIDENCE WHICH HAS BEARING ON AN IDENTIFICATION TESTIMONY.

16. PROSECUTION HAS OBLIGATION NOT TO LET FALSE EVIDENCE GO UNCORRECTED AT TRIAL, EVEN IF PROSECUTION DID NOT SOLICIT IT.

17. PROSECUTOR MUST REVEAL ANY KNOWN CONTRARY STATEMENTS OF HIS OWN WITNESSES EVEN THOUGH HE MAY BELIEVE CURRENT TESTIMONY TO BE TRUE.

18. WITNESSES FAVORABLE TO THE ACCUSED OR EXISTENCE OF.

19. ALL INDICIA RECOVERED DURING SEARCHES AND OR LETTERS TAKEN OF OR WRITING USED, IN THIS CASE AND OR TRIAL.

    THE STATE UNDER CALIFORNIA LAW IS DUTY BOUND TO TURN OVER ALL MATERIAL EVIDENCE WHETHER REQUESTED BY THE DEFENSE OR NOT.

    DATED JULY 27TH 1998

                                    Antonio Williams
                                    Pro Per

*SGT JUAREZ TESTIMONY*

**Exhibit**

**2**

 1   PATAJO.

 2   Q.    ALL THREE OF THOSE WERE MEN?

 3   A.    YES.

 4   Q.    YOU HAD ALL THREE OF THOSE MEN COME TO THE PHYSICAL

 5   LINEUP AND PARTICIPATE IN THE PHYSICAL LINEUP?

 6   A.    YES.

 7   Q.    THAT HAPPENED IN THE EVENING TIME OF APRIL 8TH,

 8   1997, IS THAT RIGHT?

 9   A.    YES, IT DID.

10   Q.    NOW, BEFORE APRIL 8TH, 1997, DID YOU HAVE OCCASION

11   TO INTERVIEW THOSE THREE MEN, EITHER AKIRA MENDOZA,

12   RIZALINO PATAJO, OR GUSTAVO CONTRERAS?

13   A.    I TALKED TO THE BANK MANAGER AT THE TIME OF THE

14   ROBBERY AT MISSION NATIONAL BANK.

15   Q.    AT ANY TIME, DID YOU SHOW EITHER OF THOSE THREE

16   MEN -- BEFORE THE PHYSICAL LINEUP, AT ANY TIME DID YOU

17   EVER PERSONALLY EVER SHOW ANY PHOTOS AT ALL?

18   A.    NO.

19   Q.    ANY PHOTOS OF THE DEFENDANT?

20   A.    NO.

21   Q.    ANY PHOTOS OF OTHER SUSPECTS?

22   A.    NO.

23   Q.    ANY PHOTOGRAPHIC LINEUP AT ALL?

24   A.    NO, I DID NOT.

25   Q.    TO YOUR KNOWLEDGE AT ALL, AT ANY TIME BEFORE THEY

26   PARTICIPATED IN THAT PHYSICAL LINEUP, APRIL 8TH, 1997,

27   WERE ANY OF THOSE THREE MEN SHOWN A PHOTOGRAPHIC LINEUP?

28   A.    NO, NOT TO MY KNOWLEDGE.

1    Q.    , AND BY "PHOTOGRAPHIC" LINEUP, I MEAN SIX PHOTOS IN A

2    LINE TOGETHER, PEOPLE WITH SIMILAR DEMOGRAPHICS, AND

3    HAVING THE WITNESS CHOOSE THE PERSON WHO ROBBED THEM OUT

4    OF THAT PHOTO LINEUP?

5    A.    YES.

6    Q.    AT NO TIME, TO YOUR KNOWLEDGE, WAS ANY PHOTOGRAPHIC

7    LINEUP DONE BEFORE APRIL 8TH, 1997?

8    A.    NO.

9    Q.    DID YOU, YOURSELF, AFTER APRIL 8TH, 1997, EVER

10   CONDUCT A PHOTOGRAPHIC LINEUP?

11   A.    NO.

12   Q.    SO, BASICALLY, FOR THIS MISSION NATIONAL BANK

13   INCIDENT, TO YOUR KNOWLEDGE NO PHOTOGRAPHIC LINEUP HAS

14   EVER BEEN CONDUCTED?

15   A.    NO.

16   Q.    NOW, OTHER THAN THAT PHYSICAL LINEUP OF APRIL 8TH,

17   1997, TO YOUR KNOWLEDGE WAS THERE ANY OTHER PHYSICAL

18   LINEUP THAT TOOK PLACE?

19   A.    NO.

20   Q.    NOW, AT THAT PHYSICAL LINEUP, ALL THREE OF THOSE

21   WITNESSES AND VICTIMS IDENTIFIED THE DEFENDANT, IS THAT

22   RIGHT?

23   A.    THAT IS CORRECT.

24   Q.    TO YOUR KNOWLEDGE, DID ANY -- LET ME WITHDRAW THAT.

25        DO YOU KNOW WHAT A "SHOWUP" IS?

26   A.    YES.

27   Q.    TELL THE COURT WHAT A SHOWUP IS.

28   A.    WELL, MY DEFINITION OF FIELD SHOWUP WOULD BE SHORTLY

1   AFTER A CRIME OCCURS, SOMEONE IS STOPPED ON THE STREET OR

2   SOMEONE IS DETAINED, AND THE WITNESSES OR THE VICTIM WILL

3   BE BROUGHT OUT TO THE LOCATION OF WHERE THE SUSPECT IS

4   DETAINED TO LOOK AT THE SUSPECT AND SEE IF THAT'S THE ONE

5   WHO COMMITTED THE CRIME.

6   Q.    TO YOUR KNOWLEDGE, IN THIS CASE, AT ANY TIME, WAS

7   THERE A SHOWUP, EITHER BEFORE OR AFTER THAT PHYSICAL

8   LINEUP OF APRIL 8TH, 1997?

9   A.    NO.

10   Q.    SO, TO YOUR KNOWLEDGE, THE SOLE MEANS OF

11   IDENTIFICATION IN THIS PARTICULAR CASE BY EITHER GUSTAVO

12   CONTRERAS, RIZALINO PATAJO, AND AKIRA MENDOZA WAS WHEN

13   THEY IDENTIFIED THE DEFENDANT IN THE PHYSICAL LINEUP ON

14   THE NIGHT OF APRIL 8TH, 1997?

15   A.    YES.

16   Q.    NOW, YOU WENT AND TESTIFIED AT A PAROLE HEARING

17   SOMETIME AFTER APRIL 8TH, 1997, IS THAT RIGHT?

18   A.    YES, THAT'S CORRECT.

19   Q.    AND THAT PAROLE HEARING WAS TAPED, IS THAT RIGHT?

20   A.    THAT'S CORRECT.

21   Q.    YOU LISTENED TO THAT TAPE UPSTAIRS, I PLAYED IT FOR

22   YOU EARLIER THIS MORNING?

23   A.    YES, I DID.

24   Q.    SOMETIME IN THAT PAROLE HEARING ON THAT TAPE, YOU

25   ONCE REFERRED TO A "PHOTO" LINEUP?

26   A.    THAT'S CORRECT.

27   Q.    WHAT DID YOU MEAN WHEN YOU REFERRED TO THAT "PHOTO"

28   LINEUP?

1      THE DEFENDANT:  EXCUSE ME, YOUR HONOR.  I'D LIKE

2   TO EXCUSE MYSELF TO ANYTHING FURTHER.

3      THE COURT:  I SUGGEST YOU STAY HERE.  IF YOU

4   WANT TO EXCUSE YOURSELF, YOU HAVE TO MAKE AN APPROPRIATE

5   MOTION AND WHATEVER IS INVOLVED.

6      THE DEFENDANT:  THIS IS A DISCRIMINATORY

7   PROCESS, THE OAKLAND POLICE FRAMING.  HE HAS WITNESSES.

8   AS I SAID, I AM NOT GETTING JUSTICE IN ALAMEDA COUNTY.

9   I'D PREFER TO FILE MY MOTIONS IN FEDERAL COURT FOR

10  VIOLATIONS IN ALAMEDA COUNTY.

11     THE COURT:  WHATEVER MOTIONS YOU HAVE TO MAKE,

12  YOU HAVE TO MAKE IT.

13     THE DEFENDANT:  AGAIN, YOUR HONOR, I'M NOT

14  PARTICIPATING.  I'D LIKE TO EXCUSE MYSELF UNTIL AFTER YOU

15  AND THE REST OF YOU PEOPLE'S HEARING.

16     THIS IS YOUR COURT.  THIS IS YOUR HEARING.  I

17  HAVE NO RIGHTS HERE.  I OBJECT.  THIS IS A BIASED

18  SITUATION.  I'D LIKE TO EXCUSE MYSELF.

19     THE COURT:  SO YOU'RE REFUSING TO STAY IN THE

20  COURTROOM AND REPRESENT YOURSELF?

21     THE DEFENDANT:  I'M REFUSING TO PARTICIPATE IN

22  YOUR AND THE PROSECUTION 1538.5.  YOU'VE BROKEN THE LAW,

23  VIOLATED MY RIGHTS.  I'LL OBJECT.  AND I'M EXCUSING

24  MYSELF.

25     THE COURT:  I THINK WHAT I'LL DO IS TAKE A

26  RECESS WHILE HE IS EXCUSING HIMSELF, AND DO WHAT I CAN TO

27  REVIEW THE SITUATION AND SEE WHERE WE GO FROM THERE.

28     MR. BURKE:  YOUR HONOR, CAN THIS WITNESS BE

1  EXCUSED AT THIS TIME, SINCE WE'RE SO CLOSE TO NOON, AND

2  HAVE HIM EXCUSED AT LEAST UNTIL MONDAY?

3          THE COURT:  OH, SURE.

4          MR. BURKE:  THANK YOU.

5                  (NOON RECESS)

6                  ---000---

SGT JUAREZ Testimony

1  A.      Yes, I did.

2  Q.      And that transcript is a generally accurate depiction

3  of the taped parole interview by the parole board?

4  A.      Yes.

5  Q.      Now, at the beginning of that tape, you referred to a

6  photo lineup, is that right?

7  A.      That's correct.

8  Q.      And as you have testified before, there was never any

9  photo lineup?

10 A.      That's correct.

11 Q.      You were -- you meant to say physical lineup when you

12 said photo lineup?

13 A.      Yes.

14 Q.      Now, if you keep reading the entire transcript that

15 we have just -- of the portion of the tape that we just

16 played, you are talking about that physical lineup, is that

17 right?

18 A.      Yes, that's correct.

19 Q.      Three witnesses that you are referring to who

20 identified the defendant, you were referring to Gustavo

21 Contreras, Akira Mendoza and Rizalino Patajo?

22 A.      Yes, I am.

23 Q.      And all of that conversation that you have with the

24 parole board people, are you constantly over and over again

25 talking about the physical lineup?

26 A.      Yes, that's correct.

27 Q.      And even several times in this, you refer to it as

28 the physical lineup?

1   A.     Yes.

2   Q.     It was just at the beginning that you misspoke?

3   A.     Yes, that's correct.

4   Q.     Now, you, yourself, were at that physical lineup, is

5   that right?

6   A.     Yes, I was.

7   Q.     And ultimately, the defendant picked all of his

8   fillers, is that right?

9   A.     That's correct.

10   Q.     Were they all generally relatively close in age?

11   A.     Yes.

12   Q.     They were all about the same height?

13   A.     Yes.

14   Q.     They were all about the same weight?

15   A.     Yes.

16   Q.     And they were all African American men, is that

17   right?

18   A.     Yes.

19   Q.     Now, further evidence that you were talking about the

20   physical lineup is when you referred to the three statements

21   of the witnesses, is that right?

22   A.     Yes, that's correct.

23         MR. BURKE:  Your Honor, I would like to have these

24   three follow-up statements marked as People's 14, 15 and 16

25   for identification.  Fourteen will be Gustavo Contreras'

26   supplemental statement, 15 will be Rizalino Patajo's, and 16

27   will be Akira Mendoza's statement.

28

1            (Contreras Statement, Patajo Statement, Mendoza

2            Statement are marked as Plaintiff's Exhibit

3            Nos. 14, 15 & 16, respectively, for

4            identification.)

5    Q.      Now, when you are talking about that physical lineup

6    at the parole board, you refer to their three statements, is

7    that right?

8    A.      Yes.

9    Q.      And you explain why Gustavo Contreras put a question

10   mark on his physical lineup card?

11   A.      Yes.

12   Q.      And that was because he said that now the guy had a

13   little bit more facial hair, is that right?

14   A.      Yes, that's correct.

15   Q.      Other than that, he knew it was the guy?

16   A.      Yes, and he seemed a little taller at the bank.

17   Q.      Showing you People's 10, 11 and 12 for

18   identification, are those the three lineup cards that you

19   were referring to in your statement to the parole board?

20   A.      Yes.

21   Q.      And you, yourself, were -- you were the person that

22   ultimately collected all of those lineup cards and placed

23   them into evidence?

24   A.      Yes.

25        MR. BURKE:  Your Honor, at this time, I would move

26   People's 10, 11 and 12 into evidence.

27        THE COURT:  Mr. Williams?

28        MR. WILLIAMS:  Submitted.

977

1           THE COURT:  No objection?

2           MR. WILLIAMS:  No objection.

3           THE COURT:  Ten, 11 and 12, the three lineup cards,

4    will be admitted.

5           (Plaintiff's Exhibit Nos. 10, 11, and 12 are

6           received in evidence.)

7           MR. BURKE:  Q.  Showing you People's 14, 15 and 16

8    for identification, those are the three statements that were

9    taken by the three witnesses from the Mission National Bank

10   after they participated in the physical lineup, is that

11   right?

12   A.      Actually, two of them are.

13   Q.      Did I mismark one?

14   A.      One of them is actually from one taken at the scene.

15   Q.      Okay.  I'm sorry.  I'm going to have -- that's

16   People's 15 that you pulled out, is that right?

17   A.      Yes.

18   Q.      They all start to look alike after a while.

19           I'm going to have this remarked as People's 15, and

20   it is dated April 8, 1997.

21           Now, the two statements that you are looking at right

22   now, and I'll give you the third -- thank you -- I'll give

23   you the third, all of those are dated April 8, 1997, is that

24   right?

25   A.      Yes, that's correct.

26   Q.      And all of those were taken after the physical lineup

27   took place, is that right?

28   A.      Yes.

SGT JUAREZ TESTIMONY

978

1  Q.     Now, even though you misspoke that one word in the

2  tape to the parole board, there was never any photographic

3  lineup, is that right?

4  A.     No, there wasn't.

5  Q.     You are absolutely certain of that?

6  A.     Yes.

7  Q.     Not before or after the physical lineup, is that

8  right?

9  A.     That's right.

10 Q.     Other than the surveillance photos, you never showed

11 any photos of the defendant to any witnesses, is that right?

12 A.     That's correct.

13 Q.     Now, after the defendant was developed as a suspect,

14 you came into contact with him, is that right?

15 A.     Yes, that's correct.

16 Q.     You looked at the surveillance photos, is that right?

17 A.     That's correct.

18 Q.     The person depicted in the surveillance photos, I'll

19 show you 3 and 4 in evidence, they appear to you to be the

20 defendant?

21 A.     Yes.

22 Q.     You were confident of that after seeing those

23 surveillance photos, is that right?

24 A.     Yes.

25 Q.     You see the surveillance photos all the time in your

26 duties as a robbery investigator at the Oakland Police

27 Department, is that right?

28 A.     Yes.

1      MR. BURKE:  At this time, I don't have any further
2 questions of Sergeant Juarez.

3

4                    CROSS-EXAMINATION

5      MR. WILLIAMS:  Q.  How are you doing, Mr. Juarez?
6 A.      Good.

7 Q.      I would like to --

8      THE COURT:  Maybe it makes the most sense, you want
9 to get started on your cross-examination?

10      MR. WILLIAMS:  I would like to get started, because I
11 want to keep -- I want the jurors to keep an open mind of
12 something before we leave.

13      THE COURT:  I'll go for 10 or 15 minutes.  It is
14 right at noon.  Go ahead.

15      MR. WILLIAMS:  Q.  I want to say a few things and we
16 can break.

17      Mr. Juarez, you spoke about some inconsistent
18 statements made to you with regards to me wearing hats, am I
19 right?

20 A.      That's correct.

21 Q.      I state for the record in front of these people, and
22 I'm going to show that beyond a reasonable doubt that that is
23 correct, I was arrested, to your knowledge and to the
24 records, a few days prior before these charges for possession
25 charges, am I correct?

26 A.      I remember, there was a possession arrest.  I don't
27 remember the exact date before this, yes.

28 Q.      You just in your statement here in the parole board

"SGT THURMAN TESTIMONY" "EXHIBIT"

M

1  suggest to any of the witnesses who to pick?

2  A.      Absolutely not.

3  Q.      Did you ever coerce them into picking a particular

4  person?

5  A.      No, I simply asked them to mark their cards if they

6  could.

7  Q.      You never threatened any of the witnesses?

8  A.      No.

9  Q.      You never encouraged them in any way to pick a

10  particular person?

11  A.      Or anybody at all, no, sir.

12  Q.      At any time before this physical lineup took place,

13  did you show any photographic lineups to any of these

14  witnesses in conjunction with your investigation in this

15  case?

16  A.      No, sir.

17  Q.      At any time after this physical lineup, did you show

18  any photographic lineups to any witnesses in conjunction with

19  this case?

20  A.      No, sir.

21  Q.      Did you ever see Sergeant Juarez show a lineup to

22  anyone at any time in conjunction with the investigation of

23  this case?

24  A.      I did not.

25  Q.      At any time, did you see any sergeants or any law

26  enforcement agents show any photographic lineups to any

27  witnesses in conjunction with the investigation of this case?

28  A.      No, sir.